**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| JESSICA MORRIS,<br><br>Plaintiff,<br><br>vs.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br><br>Defendant. | CASE NO. 1:25-CV-01067<br><br>MAGISTRATE JUDGE AMANDA M. KNAPP<br><br>**MEMORANDUM OPINION AND ORDER** |

Plaintiff Jessica Morris ("Plaintiff" or "Ms. Morris") seeks judicial review of the final decision of Defendant Commissioner of Social Security denying her application for Social Security disability benefits. (ECF Doc. 1.) This Court has jurisdiction pursuant to 42 U.S.C. § 405(g). This matter is before the undersigned by consent of the parties under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73. (ECF Doc. 5.) For the reasons set forth below, the Court **AFFIRMS** the Commissioner's decision.

## I. Procedural History

Ms. Morris filed an application for Disability Insurance Benefits on May 12, 2021 ("DIB") and an application Supplemental Security Income ("SSI") on May 18, 2021, alleging disability since July 7, 2012.[1] (Tr. 126-27, 2803.) She alleged disability due to anxiety, post-traumatic stress disorder, depression, knee issues, and mental illnesses. (Tr. 448, 3136.) After denial of her claims on initial review and reconsideration (Tr. 214-23, 227-34), she requested a

[1] Ms. Morris later amended her alleged onset date to May 12, 2021, withdrawing her DIB application. (Tr. 2803.) Her prior DIB and SSI applications were denied by an Administrative Law Judge on May 9, 2018. (*Id.*)

hearing (Tr. 236-37). Ms. Morris received three unfavorable Administrative Law Judge ("ALJ") decisions. (Tr. 15-38, 176-206, 2800-32.)

The first unfavorable ALJ decision was issued on July 12, 2022. (Tr. 176-206.) The Appeals Council reversed and remanded that decision on August 25, 2022, finding the ALJ did not properly apply *res judicata* when dismissing Ms. Morris's request for a hearing through May 9, 2018, and did not adequately evaluate the prior administrative medical findings when assessing Ms. Morris's residual functional capacity ("RFC"). (Tr. 207-11.)

Following remand, a second hearing was held on January 4, 2023, at which Ms. Morris, a medical expert, and vocational expert testified. (Tr. 60-77.) Following that hearing, the second unfavorable decision was issued on March 7, 2023. (Tr. 15-38.) The case was remanded by the District Court per stipulation of the parties on February 11, 2023. (Tr. 2945.) The Appeals Council then vacated the final decision of the Commissioner on February 29, 2024. (Tr. 2947-51.) The Appeals Council found that the hearing decision did not provide an adequate evaluation of the opinion evidence, including the opinions offered by medical expert Alex Alireza Emami, M.D., and state agency psychological consultants Janet Souder, Psy.D., and Kristen Haskins, Psy.D. (Tr. 2949-51.) The Appeals Council ordered consolidation of the pending claims with an SSI claim that Ms. Morris filed on June 7, 2023, concluding that the "Appeals Council's action with respect to the current electronic claims render[ed] the subsequent claim duplicate." (Tr. 2951, *see also* Tr. 2803.)

Following remand, a third hearing was held before a newly assigned ALJ on August 22, 2024. (Tr. 2849-89.) Ms. Morris amended her alleged onset date at the hearing to May 12, 2021, and withdrew the DIB application. (Tr. 2803, 2855-56.) The third unfavorable ALJ decision was issued on September 13, 2024. (Tr. 2800-32.) The ALJ found Ms. Morris had not

been under a disability within the meaning of the Social Security Act from May 12, 2021, through the date of the decision. (*Id.*) The Appeals Council considered Plaintiff's written exceptions to the ALJ's decision and found no reason to assume jurisdiction, making the ALJ's September 13, 2024 decision the final decision of the Commissioner. (Tr. 2731-34.)

On May 27, 2025, Ms. Morris filed a Complaint challenging the Commissioner's final decision denying her application for Social Security disability benefits. (ECF Doc. 1.) The matter is fully briefed. (ECF Docs. 9, 11.) Ms. Morris raises two issues in this appeal:

(1) whether the ALJ committed reversible error when she did not provide a logical bridge between the evidence and her residual functional capacity assessment, in particular the need for working in a relatively isolated work station; and

(2) whether the ALJ failed to properly weigh the state agency physician (Dr. McKee) opinion that Ms. Morris could not stand or walk more than one hour per day.

(ECF Doc. 9, pp. 1, 19-25.)

## II. Evidence

### A. Personal, Educational, and Vocational Evidence

Ms. Morris was born in 1985, making her a younger individual under Social Security regulations on the alleged disability onset date. (Tr. 2821.) She lived with her grandparents. (Tr. 454, 2808.) She had a limited education, having completed school through the 9th grade, and had no past relevant work. (Tr. 2821, 2860.)

### B. Relevant Treatment History

#### 1. Physical Impairment Treatment History

On January 24, 2021, Ms. Morris presented to the emergency room after falling down three stairs when her left knee gave out. (Tr. 821.) She had a history of chronic bilateral knee pain and twisted her left knee when falling. (*Id.*) Left ankle pain and left lateral hip pain started after her fall. (*Id.*) X-rays of the left knee showed no acute fracture or dislocation, but moderate

tricompartmental osteoarthritis that was advanced for her age. (Tr. 1188-91.) She was given crutches, a knee immobilizer, and oxycodone for pain. (Tr. 823.) She was discharged home in stable condition and advised to follow up with an orthopedic surgeon and remain non-weightbearing. (*Id.*)

On February 10, 2021, Ms. Morris followed up with Julian Gatta, M.D., in the Orthopaedic Surgery Clinic. (Tr. 817.) Her examination showed tenderness over the lateral joint line, decreased range of motion of the left knee, and pain with McMurray's testing. (Tr. 819-20.) Dr. Gatta ordered an MRI of the left knee and instructed Ms. Morris to wear a CAM boot for two weeks for Achilles tendonitis. (Tr. 820.) He also prescribed Voltaren gel. (*Id.*) Ms. Morris's February 26, 2021 left knee MRI showed multiple loose bodies within the posterior capsule, severe patellofemoral cartilage loss, a degenerative tear of the lateral meniscus, and focal severe chondral loss of the lateral femoral condyle. (Tr. 1183-84.)

On March 17, 2021, Ms. Morris saw Lucas Haase, M.D., in the Orthopaedic Surgery Clinic for follow up regarding her MRI. (Tr. 813.) Ms. Morris reported a significant history of left knee patellar dislocations, with the most recent one a month earlier. (*Id.*) The CAM boot provided relief for her Achilles tendonitis. (*Id.*) She was not interested in physical therapy for her Achilles tendon because she was concerned about her knee. (*Id.*) Her examination showed tenderness over the lateral and medial joint lines, moderate knee effusion, decreased range of motion, and tenderness over the Achilles tendon. (Tr. 815-16.) Dr. Haase referred Ms. Morris to Dr. Beverley for evaluation. (Tr. 816.)

On April 8, 2021, Ms. Morris presented to Nebasi Valantine, M.D., and Laurel Beverley, M.D., for evaluation regarding pain, swelling, loss of range of motion, stiffness, and effusion in the left knee. (Tr. 810.) She reported constant throbbing and aching left knee pain, which was

aggravated by going up and down stairs, ambulating, bending, standing and sitting for prolonged periods, and rising from a chair. (Tr. 810-11.) Her pain was relieved by heat, Tylenol, and Lidocaine ointment. (Tr. 811.) She was 5'9" and weighed 296. (*Id.*) Examination of the left knee / lower extremity showed diffuse tenderness, decreased range of motion, moderate crepitus, positive McMurray's test and J-sign, negative Ober's test, full strength, and nonantalgic gait. (*Id.*) Left knee x-rays taken that day showed osteoarthritis, loose bodies, and patella tracks laterally, findings that were noted to be more severe than one would expect for someone Ms. Morris's age. (Tr. 1181-82.) Ms. Morris was diagnosed with tricompartmental arthritis with degenerative meniscus tears and a suprapatellar loose body. (Tr. 812.) Dr. Beverley noted that Ms. Morris's arthritis was much greater than anticipated for her age, with her weight a contributing factor. (*Id.*) Dr. Beverley recommended left knee arthroscopy. (*Id.*)

On April 12, 2021, Dr. Beverley performed a left knee arthroscopy with medial and lateral meniscectomy, shaving, and articular cartilage debridement. (Tr. 807-10.) At her first post-operative visit on April 20, 2021, Ms. Morris ambulated without crutches and reported occasional use of a walker. (Tr. 801.) She said the pain was "horrible" for the first few days following her surgery, but the pain was better, and she was working on her post-op knee instructions. (*Id.*) Dr. Beverley noted that Ms. Morris was doing "well" status-post knee arthroscopy. (Tr. 802.) She instructed Ms. Morris to continue her home exercises and to use ice, elevation, and NSAIDs as needed for pain and swelling. (*Id.*) Dr. Beverley advised Ms. Morris that: her arthritis would not be resolved with arthroscopy; she might experience an exacerbation of symptoms for up to two months after surgery; and she would need to return to arthritis management six to eight weeks after her operation. (*Id.*)

On July 23, 2021, Ms. Morris presented to the emergency room, complaining of constant, severe, right knee pain and right hip pain that started the day before and radiated down her right leg. (Tr. 2063-64.) She reported jumping on her brother while playing with him when her right knee gave out, she felt a crack, and swelling started immediately. (Tr. 2064.) She was anxious and tearful, and her examination showed tenderness over the right lateral hip and hip joint, diffuse tenderness over the anterior aspect of the right knee, and extremely limited range of motion in the right knee. (*Id.*) X-rays of the right knee showed no acute right knee fracture or dislocation, moderate effusion, and knee joint arthropathy, advanced for her age and most prominent at the patellofemoral compartment.[2] (Tr. 2068-69.) Ms. Morris was prescribed a knee immobilizer and a dose of Percocet for pain; she already had crutches at home. (Tr. 2066.)

Ms. Morris returned to Dr. Beverley on September 7, 2021, complaining of "right knee pain and catching" for four months that started with increased weight bearing during her recovery from her left knee surgery. (Tr. 2103-04.) She told Dr. Beverley that her left knee had "been great" following surgery. (Tr. 2104.) Ms. Morris's weight had decreased to 290 pounds. (*Id.*) She ambulated with an antalgic gait and examination of her right knee / lower extremity showed moderate effusion, tenderness, reduced range of motion, moderate crepitus, full strength, and intact sensation. (*Id.*) Dr. Beverley ordered an MRI of the right knee and encouraged Ms. Morris to continue with her weight loss. (Tr. 2104-05.)

Ms. Morris returned for a video visit with Dr. Beverley on October 8, 2021, after getting an MRI of her right knee on October 6, 2021. (Tr. 2102.) The MRI showed multiple large loose bodies and end-stage cartilage loss of the patellofemoral compartment and the lateral femoral articular surface. (Tr. 2113-14.) She reported increased locking, catching, and pain in her knee.

[2] It was noted that chondrocalcinosis should be considered. (Tr. 2069.)

(Tr. 2102.) Acetaminophen, massage, and rest helped with her symptoms. (*Id.*) She could ambulate for fifteen minutes without an assistive device. (*Id.*) Dr. Beverely noted that Ms. Morris had good results following her left knee surgery; arthroscopic surgery was planned for the right knee. (Tr. 2102-03.)

On October 13, 2021, Ms. Morris was evaluated by primary care physician Davis Fenos, M.D., to establish care. (Tr. 2097-2101.) She reported depression and using food to make herself feel better, which she admitted had resulted in weight gain. (Tr. 2097.) Examination findings were generally normal, although Dr. Fenos noted that Ms. Morris was obese, tearful, and sad. (Tr. 2099-2100.) She requested medication for her knee pain "to tide her over" until her surgery. (Tr. 2097.) Ms. Morris was diagnosed with depression, provided a referral for weight management, and prescribed Voltaren to be used for pain. (Tr. 2101.)

On November 1, 2021, Dr. Beverley performed arthroscopy and mini-open loose body removal of the right knee. (Tr. 2088-91.) Ms. Morris saw Dr. Beverley on November 16, 2021, for her first post-op follow up, reporting that her pain was not being managed with acetaminophen 1000 mg q8h. (Tr. 2203.) She had visited the emergency room for pain two days earlier and was provided oxycodone until her scheduled post-op follow up. (Tr. 2177-80, 2203.) She reported moderate knee swelling that was decreasing. (Tr. 2203.) She had been working on her knee exercises per post-op instructions. (*Id.*) She was ambulating with a walker. (*Id.*) She reported increased pain due to taking care of her grandparents. (*Id.*) Dr. Beverley noted that Ms. Morris was occasionally tearful, but in no acute distress and doing "ok" post knee arthroscopy. (Tr. 2204.) Examination showed mild effusion, decreased range of motion, minimal peri-incisional numbness, no crepitus, and intact strength. (*Id.*) Dr. Beverley found that bony debridement and open component were likely causes of increased pain from her surgery. (*Id.*)

Dr. Beverley increased Ms. Morris's acetaminophen, added topical Diclofenac, instructed Ms. Morris to use ice and elevation, and recommended physical therapy. (*Id.*) She also recommended that Ms. Morris restart clonazepam, noting that untreated anxiety could heighten her pain response. (*Id.*)

On November 17, 2021, Ms. Morris saw Dr. Fenos for a routine health visit. (Tr. 2205.) She reported her mood had improved since she had stopped drinking. (*Id.*) Her weight had increased to 302 pounds (Tr. 2208), but she reported eating better and was interested in a weight-loss referral (Tr. 2205).

On February 23, 2022, Ms. Morris met with Meredith Pressnell, APRN-CNP, in the Weight Management Clinic. (Tr. 2256.) She reported struggling with excess weight for years and was interested in bariatric surgery. (Tr. 2256, 2258.) She denied use of an assistive device and reported that her exercise consisted of walking up and down stairs until her knees gave out. (Tr. 2264.) She lived with her grandparents and said she shopped for food, prepared food at home, and ate out three times a month. (Tr. 2263-64.) She weighed 295 pounds and her BMI was 43.67. (Tr. 2264.) Examination findings were unremarkable, aside from a notation that she was obese. (Tr. 2257, 2265.) Her plan was to log all meals, follow a "healthy plate," drink water, and exercise for 150 minutes per week, with a mix of cardio and body resistance. (Tr. 2265.) She was advised to stop using marijuana. (Tr. 2266.) CNP Pressnell noted Ms. Morris's knee pain was fairly controlled at that time, and instructed Ms. Morris to continue Tylenol as needed and to work on weight loss to decrease pressure on her joints and back. (*Id.*)

On March 11, 2022, Ms. Morris met with Amelia Dorsey, M.D., for a bariatric surgical consultation. (Tr. 2303.) She complained of back pain and said that her mood was stable on her current medications. (Tr. 2303.) She weighed 292 pounds and her BMI was 43.15. (Tr. 2308.)

Ms. Morris's gait was normal on examination. (Tr. 2309.) Dr. Dorsey began the process of getting Plaintiff approved and prepared for a laparoscopic sleeve gastrectomy. (*Id.*)

On April 20, 2022, Ms. Morris met with Margaret O'Keefe, R.D., for a nutrition assessment for her planned bariatric surgery. (Tr. 2398.) She reported that her current exercise consisted of walking steps in her home until her knees caused her to stop. (Tr. 2401.) She also reported doing the shopping and cooking. (Tr. 2402.) Ms. Morris returned to CNP Pressnell for follow up on June 22, 2022 (Tr. 2506), reporting that things were "going well right now" (Tr. 2509). She was walking around the block five to six times a week for 30 minutes and doing leg/arm exercises for 30 minutes. (Tr. 2507, 2509.)

On July 15, 2022, Ms. Morris presented to the emergency room, complaining of right knee, hip, and ankle pain, after her right knee buckled and she fell on her knee while mowing her lawn. (Tr. 2556.) She was able to drive to the emergency room but had not been able to bear weight since the injury. (*Id.*) Her examination showed swelling and tenderness of the right knee with no laxity, and negative anterior and posterior drawer tests; her extremities were otherwise normal. (Tr. 2558.) X-rays of the right knee demonstrated osteoarthritis and a suprapatellar effusion without bony abnormality. (Tr. 2559.) Ms. Morris was given a Percocet for pain after receiving minimal relief from an intramuscular Toradol injection. (*Id.*) Knee sprain was suspected, and Ms. Morris was placed in a knee immobilizer and given crutches. (*Id.*)

On December 29, 2022, Ms. Morris sought treatment at the emergency room, complaining of left knee and hip pain after slipping on the ice the day before. (Tr. 2647.) She rated her pain a 9 out of 10. (*Id.*) Her pain was aggravated by weight-bearing and motion. (*Id.*) She said Tylenol "sort of helped." (*Id.*) Examination of the left lower extremity showed: brisk capillary refill distally, normal sensation to touch, proprioception distally, and soft compartments

throughout; ability to flex and extend the knee actively with pain and passively without difficulty; a small ballotable effusion and tenderness in the lateral joint line without crepitus or step-off; no laxity to valgus or varus stress; and a negative anterior drawer sign. (Tr. 2649.) X-rays of the left knee and hip showed no acute fracture or dislocation. (Tr. 2649-50.) There was a small joint effusion and degenerative joint space narrowing involving three compartments with osteophytic spurring and subchondral sclerosis in the left knee. (Tr. 2649.) She was discharged home in improved condition; she stated she had crutches home. (Tr. 2650-51.)

Ms. Morris saw Dr. Beverley for follow up on January 5, 2023, reporting increased pain in her left knee due to her recent fall and increased pain in her right knee from increased weight bearing on the right. (Tr. 3206.) Examination of the knees showed mild effusion, bilateral joint-line and peripatellar tenderness, decreased range of motion with no instability, moderate crepitus, intact sensation, and normal strength in the quadriceps and hamstrings. (*Id.*) Ms. Morris was diagnosed with bilateral knee arthritis and morbid obesity. (Tr. 3207.) Dr. Beverley instructed Ms. Morris she could increase acetaminophen up to 4000 mg/day if needed and encouraged Ms. Morris to consider intra-articular injections since she could not use oral anti-inflammatories. (*Id.*) Dr. Beverley also ordered physical therapy and advised Ms. Morris to continue to work on weight loss. (*Id.*) Dr. Beverley transferred Ms. Morris's care to non-operative providers until Ms. Morris was ready for a total knee arthroplasty, noting there were no surgical issues that required Ms. Morris to follow up with her. (*Id.*)

Ms. Morris reported walking around the block three times a week for fifteen minutes at an April 5, 2023 weight management appointment with CNP Pressnell. (Tr. 3193.) She was continuing to work on losing weight. (Tr. 3195.)

On April 28, 2023, Ms. Morris presented to Raafay Syed, M.D., in Physical Medicine and Rehabilitation to evaluate her bilateral knee pain. (Tr. 3190-92.) Physical examination findings were normal, including a bilateral knee examination. (Tr. 3191.) Dr. Syed referred Ms. Morris for aqua therapy and discussed the importance of weight loss for knee osteoarthritis and overall health. (Tr. 3192.) Ms. Morris declined steroid injections for pain relief. (*Id.*)

On February 1, 2024, Ms. Morris saw Dr. Fenos for a routine follow-up, having last seen him two years earlier. (Tr. 3381.) She was prescribed lidocaine patches and ointment for pain but was not using either. (Tr. 3382.) Ms. Morris weighed 290 pounds and her BMI was 42.90. (Tr. 3384.) Physical and psychiatric examination findings were normal. (Tr. 3384-85.)

On April 30, 2024, Ms. Morris returned to Dr. Syed, complaining of "new onset of severe pain in both hips and down both legs that started a few weeks ago." (Tr. 3370.) Her pain was worse in her left leg as compared to other areas. (*Id.*) Examination showed: 5/5 strength in the bilateral lower extremities; intact L3 to S1 sensation to light touch; Achilles reflex 1+; and trace bilateral patellar deep tendon reflexes. (Tr. 3371.) Dr. Syed recommended a lumbar spine x-ray, possible MRI, home exercises, and physical therapy. (Tr. 3371-72.)

On July 30, 2024, Ms. Morris saw primary care provider Patrick Zak, M.D., to establish care. (Tr. 3426-28.) She complained of bilateral knee pain that was worse on the left. (Tr. 3426.) She reported that she was starting physical therapy for her knees and back. (*Id.*) She took acetaminophen for pain and also said that marijuana helped with the pain. (*Id.*) Her weight was down to 282 pounds. (Tr. 3427.) Her BMI was 41.75. (*Id.*) Dr. Zak noted that Ms. Morris was sitting comfortably, and physical and psychiatric examination findings were normal. (*Id.*) Dr. Zak started Voltaren gel for arthritis in Ms. Morris's knees. (Tr. 3428.)

Ms. Morris started physical therapy for radicular back pain, bilateral knee pain, and myofascial pain on July 31, 2024. (Tr. 3408-23.) She reported that her hip pain started three months earlier. (Tr. 3412.) She had shooting pain from her back into her left lower extremity posterior knee, with bilateral numbness and tingling in her toes. (*Id.*) She could not sleep at night because of her hip pain, and constantly moved around at night. (*Id.*) Her physical examination was limited due to "high levels of pain." (Tr. 3416.) She walked without an assistive device, but her gait was antalgic. (Tr. 3416.) She said she was able to use the stairs independently at home but with difficulty. (*Id.*) Physical therapy was recommended once a week for a total of six visits. (Tr. 3417.)

**2. Mental Health Treatment History**

Ms. Morris saw Margaret Blasse, APRN, CNS, for pharmacologic management from July 2, 2020, through March 25, 2021. (Tr. 739-94.) She reported anxiety (Tr. 741, 751, 787), anger (Tr. 741, 778), crying episodes (Tr. 751), disrupted sleep (Tr. 751, 760), depression (Tr. 778, 787), and not going out often (Tr. 778). Mental status examinations during this period showed Ms. Morris to be cooperative, with clear and normal speech and logical and organized thought processes. (Tr. 741, 751, 760, 769, 778-79, 787.) She was not delusional, but paranoia was noted because Ms. Morris felt judged by and did not trust others. (Tr. 741, 751, 760, 769, 779, 787.) Her mood was described as anxious, angry, frustrated, sad, irritable, and depressed. (Tr. 741, 751, 760, 769, 779, 787.) Ms. Morris reported difficulty with concentration and racing thoughts. (Tr. 741, 751, 760, 769, 779, 787.) In March 2021, Ms. Morris's diagnoses were mood disorder, NOS; borderline traits; and marijuana use. (Tr. 788.) Her mental health treatment was transferring to Lilia Pron, CNP, because APRN Blasse was retiring. (Tr. 789-90.)

On August 5, 2021, Ms. Morris met with APRN Pron for a pharmacologic management appointment. (Tr. 2044.) Ms. Morris's chief complaints were mood swings, anxiety, depression, anger, paranoia, poor sleep, and nightmares. (*Id.*) She reported always being anxious and not liking crowds. (*Id.*) She lived with her grandparents and helped them around the house. (*Id.*) Ms. Morris was overweight but adequately groomed with good hygiene. (Tr. 2049.) Mental status findings showed that Ms. Morris was anxious, depressed, and tearful with paranoid thoughts, but her behavior was cooperative and appropriate, she was in no acute distress, her speech was normal, she had organized and logical thought processes, she had no suicidal or homicidal ideations, there was no evidence or perceptual disturbance, she had sustained attention and concentration, her memory was within normal limits, and her judgment and insight were good. (*Id.*) Ms. Morris was diagnosed with bipolar II disorder, PTSD, generalized anxiety disorder, major depressive disorder, borderline personality disorder, and alcohol and cannabis abuse. (Tr. 2050.) APRN Pron adjusted Ms. Morris's medications, advising Ms. Morris to gradually stop Cymbalta, continue Wellbutrin XL and Klonopin, and start Prozac, Abilify, and Prazosin. (Tr. 2050-51.)

During a November 15, 2021, telehealth appointment with APRN Pron (Tr. 2125), Ms. Morris reported she was recovering from knee surgery and in pain, was depressed because she could not work, could not handle crowds, was easily irritated, and had a hard time maintaining relationships (Tr. 2127). She also reported that she was feeling much better on Prozac and Abilify. (*Id.*) A mental status examination revealed cooperative behavior, spontaneous speech with normal rate and flow, logical and organized thought process, paranoid thoughts, a depressed and anxious mood, sustained attention and concentration, normal recent and remote memory, and fair insight and judgment. (*Id.*) Ms. Morris's mental status examination revealed a depressed

and anxious mood and paranoid thoughts. (*Id.*) It also showed cooperative behavior, spontaneous speech with normal rate and flow, logical and organized thought process, sustained attention and concentration, normal recent and remote memory, and fair insight and judgment. (*Id.*) APRN Pron continued Ms. Morris's prescriptions for Prozac, Prazosin, and Klonopin, decreased her Wellbutrin prescription, and increased her Abilify prescription. (Tr. 2130-31.)

On January 25, 2022, Ms. Morris met with APRN Pron for a telehealth appointment. (Tr. 2228.) She reported she was not feeling good; she was hearing voices that were telling her to kill herself, but she denied a plan to do it. (Tr. 2230.) She felt more depressed but could not go to the hospital because she was taking care of her grandma. (*Id.*) Mental status examination findings were unchanged from her November appointment except it was noted that she was having auditory hallucinations. (*Compare* Tr. 2230 *with* Tr. 2127.) Ms. Morris's prescription for Abilify was increased and her other medications were continued. (Tr. 2233-34.)

During a telehealth visit with APRN Pron on February 22, 2022 (Tr. 2242), Ms. Morris reported that she was experiencing mood swings, having "conversations with [her] head big time," and wanted to be left alone (Tr. 2244). Mental status examination findings were unchanged from her January appointment. (*Compare* Tr. 2244 *with* Tr. 2230.) APRN Pron increased Ms. Morris's Abilify prescription and continued her other medications. (Tr. 2247-48.)

On March 8, 2022, Plaintiff had a telephone appointment with Ms. Pron (Tr. 2289), during which she reported that she had stopped using marijuana, was trying to get her blood sugar down, could not get out of her house, and felt paranoid about people watching her (Tr. 2291). Mental examination findings were unchanged from her February appointment except her behavior was described as tearful rather than cooperative. (*Compare* Tr. 2291 *with* Tr. 2244.) Ms. Morris's Prozac was increased, and her other medications were continued. (Tr. 2294-95.)

On May 13, 2022, Ms. Morris told APRN Pron during a telehealth appointment that aside from a bad cold she was doing "okay." (Tr. 2454.) Her mental status examination revealed cooperative behavior, spontaneous speech with normal rate and flow, logical and organized thought process, paranoid thoughts, auditory hallucinations, a euthymic mood, sustained attention and concentration, normal recent and remote memory, and fair insight and judgment. (*Id.*) Ms. Morris's medications were continued without change. (Tr. 2457-58.)

On June 22, 2022, Ms. Morris had a telehealth visit with Mackenzie Keriazes, Psy.D., for a bariatric surgery evaluation focused on behavioral health. (Tr. 2493-2502.) She reported regular exercise, walking around the block twice in the evenings, doing leg lifts and arm twirls, and going up and down stairs. (Tr. 2495.) She said walking around the block made her "feel better," because she got "time for [her]self." (*Id.*) She reported that her current weight was 292 pounds; her lowest weight as an adult was 160 pounds and her highest weight was 311 pounds. (Tr. 2494.) She said depression, drinking alcohol, and binge eating had contributed to weight gain. (*Id.*) Her motivations for surgery were to: improve her health, mobility, and quality of life; decrease her pain; and prevent health problems. (Tr. 2496.) Her support system included her mother, brother, grandmother, and a few friends. (*Id.*) She lived with her grandparents and assisted with caring for her grandmother. (*Id.*) Mental status findings showed Ms. Morris was cooperative and euthymic with sustained concentration and clear and coherent speech. (Tr. 2501.) Her thought process was logical and organized with tight associations, and her thought content was within normal limits. (*Id.*) Her insight and judgment were fair. (*Id.*) She was advised to abstain from alcohol and substance use in preparation for weight loss surgery. (*Id.*)

During a pharmacological management appointment with APRN Pron on July 11, 2022 (Tr. 2514-22), Ms. Morris reported that her mental health was okay, but she was tired because of

poor sleep (Tr. 2516). She was cooperative with a euthymic mood on examination. (*Id.*) Her speech was spontaneous with normal rate and flow, her thought process was logical and organized, she had sustained attention and concentration, and her recent and remote memory were within normal limits. (*Id.*) She had paranoid thoughts and auditory hallucinations. (*Id.*) Her judgment and insight were fair. (*Id.*) Her medications were continued. (Tr. 2519-21.)

Ms. Morris met again with Dr. Keriazes on July 14, 2022 (Tr. 2546-50), and August 9, 2022 (Tr. 2594-96), for bariatric pre-surgical evaluation and therapy. Ms. Morris's mental status examination findings were normal when assessed on July 14. (Tr. 2549.) But the psychological assessment conducted on July 14 suggested the "presence of notable discord/dysfunction among emotional, thought, behavioral, interpersonal, and somatic areas of functioning." (*Id.*) Ms. Morris reported being unhappy with recent weight gain when she met with Dr. Keriazes on August 9, stating she "'fell off' recently related to celebrations with food choices." (Tr. 2594.) She was abstaining from alcohol. (*Id.*) She was walking less because she had sprained her ankle. (*Id.*) During the visit she became tearful, stating she felt overwhelmed. (Tr. 2595.) She dreaded sleep because of problems using her CPAP machine and nightmares. (*Id.*) She also reported familial and caretaking stressors. (*Id.*) On mental status examination, she was cooperative and adequately groomed but anxious, depressed, dysphoric, and tearful. (*Id.*) Her speech was normal, and her thought processes were logical and organized with no abnormal thoughts noted. (*Id.*) Her attention and concentration were sustained, and her memory was within normal limits. (*Id.*) Her insight and judgment were fair. (*Id.*)

When Ms. Morris saw APRN Pron on October 7, 2022 (Tr. 2601-09), she said she was very anxious, noting her aunt with whom she was very close with had recently passed away (Tr. 2602). She reported racing thoughts, nightmares, and the inability to relax or focus. (*Id.*) She

also reported that her weight-loss surgery was being postponed because she was taking CBD and it showed in her system. (*Id.*) Her mental status examination revealed adequate grooming, tearful and cooperative behavior, spontaneous speech with normal rate and flow, logical and organized thought process, paranoid thoughts, auditory hallucinations, an anxious and depressed mood, a congruent affect, sustained attention and concentration, normal recent and remote memory, and fair insight and judgment. (Tr. 2602-03.) Prozac and Prazosin were increased and Abilify, Wellbutrin, and Klonopin were continued. (Tr. 2606-07.)

Ms. Morris met again with Dr. Keriazes on October 10, 2022 (Tr. 2615-17), and January 9, 2023 (Tr. 2725-27), to assess her behavioral health candidacy for weight loss surgery. At her October appointment, Ms. Morris was tearful with a depressed, anxious, and dysphoric mood. (Tr. 2616.) In January, she reported that she noticed her mood was improved and she was a little happier now that the holidays had passed. (Tr. 2725.) Her mental status examination findings were normal at her January appointment. (Tr. 2726.)

During a February 7, 2023 appointment with APRN Pron (Tr. 3196-3203), Ms. Morris reported she was feeling a little better (Tr. 3197). She still had anxiety and said she did not go anywhere; she was taking care of her grandmother. (*Id.*) On mental status examination, Ms. Morris was cooperative but tearful with an anxious and depressed mood. (Tr. 3197.) Her medications were continued without change. (Tr. 3201-02.)

When Ms. Morris met with APRN Pron for a telehealth visit on May 11, 2023 (Tr. 3182-89), she reported she was doing "okay" (Tr. 3183). She was feeling better with the weather being nicer and she was doing a lot of walking with her brother in the park. (*Id.*) On mental status examination, Ms. Morris's mood was euthymic. (Tr. 3183.) Otherwise, her mental status

examination findings were similar to those recorded at her February 2023 visit. (*Compare* Tr. 3183 *with* Tr. 3197.) Ms. Morris's medications were continued without change. (Tr. 3187-89.)

Ms. Morris continued to see APRN Pron for pharmacologic management from September 7, 2023, through July 8, 2024. (Tr. 3313-19, 3320-27, 3338-44, 3345-50, 3351-58, 3362-69, 3373-80, 3442-50, 3457-65.) During these sessions, Ms. Morris complained that she did not want to leave her house or go anywhere and did not want to do anything. (Tr. 3314, 3321, 3353, 3374.) She said she was depressed and anxious and had mood swings. (Tr. 3314, 3321, 3353.) She had nightmares and was wetting her bed at night as a result. (Tr. 3321, 3339.) She reported feeling depressed and angry when her mother moved in with them in the fall of 2023; she felt like she had no space of her own and her mother had brought her own problems with her. (Tr. 3321, 3346, 3353.) In January 2024, Ms. Morris reported that her mother was supposed to be moving out and she was hoping things would improve. (Tr. 3339.) As of March 2024, her mother was not living with them. (Tr. 3374.) Her brother had visited, which had improved her mood, but she still did not want to do anything, and her sleep was poor. (*Id.*) During her June 10, 2024 visit with APRN Pron, Ms. Morris reported she was about the same. (Tr. 3459.) When Ms. Morris met with APRN Pron on July 8, 2024, she reported that she was nervous about Ketamine injections because she had heard bad things about them. (Tr. 3444.) She said her knees were hurting a lot. (*Id.*) She asked for a refill of Klonopin. (*Id.*)

During this period, Ms. Morris's mental status exams showed cooperative behavior, spontaneous speech with normal rate and flow, logical and organized thought process, paranoid thoughts, auditory hallucinations, an anxious and depressed mood, congruent affect, sustained attention and concentration, normal recent and remote memory, and fair insight and judgment.[3]

[3] Ms. Morris was also tearful at some appointments in 2024. (Tr. 3339, 3374, 3444, 3459.)

(Tr. 3314, 3321-22, 3339, 3346, 3353, 3363-64, 3374, 3444, 3459.) APRN Pron adjusted Ms. Morris's medications over this time period. In September 2023, Wellbutrin and Abilify were increased and Prozac, Prazosin, and Klonopin were continued. (Tr. 3325-26.) In October 2023, APRN Pron advised Ms. Morris to gradually stop Abilify and start Rexulti because Abilify was not working. (Tr. 3317.) Her other medications were continued. (Tr. 3317-19.) Ms. Morris's medications were adjusted again in November 2023, with increases in Rexulti, Wellbutrin, and Prazosin. (Tr. 3357.) In March 2024, Atarax was added for sleep. (Tr. 3379.) In May 2024, APRN Pron increased Ms. Morris's prescriptions for Rexulti and Wellbutrin. (Tr. 3366-67.) Her other medications were continued. (Tr. 3366-68.) At Ms. Morris's July 8, 2024 appointment, APRN Pron switched Ms. Morris from Prozac to Cymbalta because Prozac was not working. (Tr. 3448.) The remainder of her medications were continued. (Tr. 3448-49.)

### C. Relevant Medical Opinion Evidence

#### 1. Physical Impairment Opinion Evidence

##### i. Medical Expert

On January 4, 2023, medical expert Alex Alireza Emami, M.D., testified at the second administrative hearing (Tr. 60, 70-72, 2632-40), saying Ms. Morris had problems in both knees, including pain, swelling, and reduced range of motion, with right knee problems worse than the left (Tr. 70). She opined that a major factor in Ms. Morris's knee problems was the need to support the weight of her body (Tr. 72). Dr. Emami opined that Ms. Morris's knee impairments did not meet a listing (Tr. 70) but that Ms. Morris had the following limitations:

- could stand and walk for 30 minutes at a time and one hour total in a workday;[4]
- needed an assistive device for walking;

[4] Dr. Emami opined that Ms. Morris had no sitting limitations. (Tr. 71, 72.)

- could lift and carry 10 pounds frequently and 20 pounds occasionally;
- could never: climb stairs, ladders, ropes, and scaffolds; balance, stoop, crawl, crouch, or kneel; be exposed to unprotected heights; or operate foot controls bilaterally;
- could occasionally be exposed to moving machinery; and
- could occasionally handle, finger, feel, reach overhead and in all other directions, and push and pull with upper extremities.

(Tr. 71-72.)

**ii. State Agency Medical Consultants**

On August 2, 2021, state agency medical consultant Elizabeth Das, M.D., completed a Physical RFC Assessment. (Tr. 143-44.) Dr. Das opined that Ms. Morris had the RFC to: occasionally lift and/or carry 20 pounds and frequently 10 pounds; sit and stand/walk each for six hours in an eight-hour workday; never climb ladders/ropes/scaffolds; and occasionally climb ramps / stairs, kneel, crouch, and crawl. (*Id.*)

On October 7, 2021, state agency medical consultant Lynn Morello, M.D., completed a Physical RFC Assessment affirming Dr. Das's opinions on reconsideration. (Tr. 165-66.)

With respect to Ms. Morris's later filed application,[5] state agency medical consultant Gerald Klyop, M.D., completed a Physical RFC Assessment on August 7, 2023. (Tr. 2929.) Dr. Klyop adopted the RFC findings from the March 7, 2023 ALJ decision, concluding that Ms. Morris could perform sedentary work except: lifting and carrying up to 20 pounds occasionally and 10 pounds frequently, sitting for 8 hours, standing and walking for 1 hour, constant pushing/pulling with the upper extremities but never foot pedal; could occasionally climb ramps but never stairs, ladders, ropes or scaffolds; could frequently stoop, could occasionally crouch;

[5] On the second remand, the Appeals Council ordered consolidation of the pending claims with an SSI claim Ms. Morris filed on June 7, 2023. (Tr. 2951, *see also* Tr. 2803.)

could never kneel or crawl; and could never be exposed to unprotected heights or dangerous moving machinery. (*Id.*)

On November 10, 2023, state agency medical consultant Steve McKee, M.D., completed a Physical RFC on reconsideration. (Tr. 2937-39.) Dr. McKee opined that Ms. Morris: could occasionally lift and/or carry 20 pounds and frequently 10 pounds; could stand and/or walk for one hour in a workday; could not operate foot pedals; could sit for about six hours in a workday; could never kneel, crawl, or climb ladders/ropes/scaffolds; could occasionally crouch and climb ramps/stairs; could frequently stoop; and should avoid all exposure to unprotected heights, commercial driving, and dangerous moving machinery. (Tr. 2938-39.)

**2. Mental Health Opinion Evidence**

**i. Treating Source**

On March 17, 2022, APRN Pron completed a Medical Source Statement – Mental Capacity form. (Tr. 2226-27.) APRN Pron opined that Ms. Morris was "extremely limited" in her ability to: describe work activity to someone else; cooperate with others; handle conflicts with others; initiate or sustain conversation; understand and respond to social cues; respond to requests, suggestions, criticism, correction, and challenges; keep social interactions free from excessive irritability, sensitivity, argumentativeness, or suspiciousness; work at an appropriate and consistent pace; ignore or avoid distractions while working; work close to or with others without interrupting or distracting them; sustain an ordinary routine and regular attendance at work; work a full day without needing more than the allotted number or length of rest periods during the day; adapt to changes; and manage her psychologically based symptoms. (*Id.*) APRN Pron opined that Ms. Morris was "markedly limited" in her ability to: identify and solve problems; sequence multi-step activities; ask for help when needed; and maintain personal

hygiene and attire appropriate to a work setting. (*Id.*) APRN Pron opined that Ms. Morris was "moderately limited" in her ability to: understand and learn terms, instructions, or procedures; follow one or two step oral instructions to carry out a task; ask and answer questions and provide explanations; recognize and mistake and correct it; use reason and judgment to make work related decisions; state own point of view; complete tasks in a timely manner; change activities or work settings without being disruptive; respond to demands; distinguish between acceptable and unacceptable work performance; set realistic goals; and be aware of normal hazards and take appropriate precautions. (*Id.*) Finally, APRN Pron opined that Ms. Morris was "mildly limited" in her ability to: initiate and perform a task that she understands and knows how to do; and make plans for oneself independent of others. (*Id.*) APRN Pron stated that the following "diagnoses and medical and clinical findings" supported her assessment: bipolar II disorder; generalized anxiety disorder; major depressive disorder, moderate; post-traumatic stress disorder; and borderline personality disorder. (Tr. 2227.)

**ii. State Agency Psychological Consultants**

On July 15, 2021, state agency psychological consultant Janet Souder, Psy.D., completed a Psychiatric Review Technique ("PRT") (Tr. 141-42) and Mental RFC Assessment (Tr. 145-46). In the PRT, Dr. Souder opined that Ms. Morris had mild limitations in her ability to understand, remember, or apply information and moderate limitations in her ability to: interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself. (Tr. 142.) In the Mental RFC Assessment, Dr. Souder opined that Ms. Morris: could perform familiar simple, routine, and repetitive tasks in a setting without expectations for sustained close concentration, fast pace, or strict production quotas and would need a relatively isolated workstation; could interact briefly and superficially on an occasional basis with a small group of familiar coworkers

and supervisors in a nonpublic setting; could adjust to minor and infrequent changes; and could handle tasks without strict time limitations or production standards. (Tr. 145-46.)

On November 23, 2021, state agency psychological consultant Kristen Haskins, Psy.D., completed a PRT (Tr. 163-64) and Mental RFC Assessment (Tr. 166-67) on reconsideration. Like Dr. Souder, Dr. Haskins opined that Ms. Morris had mild limitations in her ability to understand, remember, or apply information and moderate limitations in her ability to: interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself. (*Compare* Tr. 163 *with* Tr. 142.) In the Mental RFC, Dr. Haskins opined that Ms. Morris: could perform familiar short cycle tasks in a setting without expectations for sustained close concentration, fast pace, or strict production quotas and would need a relatively isolated workstation; could interact briefly and superficially on an occasional basis with a small group of familiar coworkers and supervisors in a nonpublic setting; could adjust to minor and infrequent changes; and could handle tasks without strict time limitations or production standards. (Tr. 166-67.)

With respect to Ms. Morris's later filed application, state agency psychological consultant Valerie Budervic, Psy.D., completed a PRT (Tr. 2927-28) and Mental RFC Assessment (Tr. 2929) on September 7, 2023. Like Drs. Souder and Haskins, Dr. Budervic opined in the PRT that Ms. Morris had mild limitations in her ability to understand, remember, or apply information and moderate limitations in her ability to: interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself. (*Compare* Tr. 2927 *with* Tr. 142, 163.) Dr. Budervic adopted the RFC findings from the March 7, 2023 ALJ decision, concluding that Ms. Morris: could not perform complex tasks but could perform simple (routine) tasks, defined to mean this person has the mental aptitude to meet the demands of competitive, remunerative, unskilled work which includes the abilities to understand, carry out and remember simple instructions on a

sustained basis; could make simple work related decisions; could respond appropriately to supervision, coworkers, and usual work situations and deal with changes in routine work settings; could focus attention on simple or routine work activities for at least two hours at a time and can stay on task for a sustained rate such as initiating and performing a task that they understand and know how to do; could work at an appropriate and consistent pace and complete tasks in a timely manner; could ignore or avoid distractions while working; could change activities or work settings without being disruptive; could do no high production quotas or piece rate work; could have superficial, occasional interactions with public and coworkers meaning limited to speaking, signaling, taking instructions, asking questions and similar contact but with no arbitration, negotiation, confrontation or supervision or commercial driving; and should not be required to work on tandem tasks in the immediate proximity to another worker. (Tr. 2929.)

On November 10, 2023, state agency psychological consultant Leslie Rudy, Ph.D., completed a PRT on reconsideration, also opining that Ms. Morris had mild limitations in her ability to understand, remember, or apply information and moderate limitations in her ability to: interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself. (*Compare* Tr. 2936 *with* Tr. 142, 163, 2927.) Dr. Rudy also completed a Mental RFC, opining that Ms. Morris: could perform simple (routine) tasks on a sustained basis; could make simple work-related decisions; could respond appropriately to supervision, coworkers, and usual work situations and deal with changes in routine work settings; could focus attention on simple or routine work activities for at least two hours at a time and stay on task for a sustained rate such as initiating and performing a task that she understands and knows how to do; could work at an appropriate and consistent pace and complete tasks in a timely manner; could ignore or avoid distractions while working; could change activities or work settings without being disruptive;

could not perform work with high production quotas or piece-rate work; and could have superficial, occasional interactions with the public and coworkers. (Tr. 2940-41.)

**D. Plaintiff's Function Report**

In a Function Report completed on June 1, 2021 (Tr. 454-65), Ms. Morris reported that she froze up, hid, and cried when she was around a lot of people (Tr. 454). She also reported that it was difficult for her to stand for hours or sit because of her knees. (*Id.*) She reported problems focusing and said things stressed her out and she was easily triggered. (*Id.*) Racing thoughts, pain and mood swings interfered with her ability to sleep. (Tr. 455.) She typically stayed to herself during the day. (*Id.*) She lived with her grandparents and helped around the house. (Tr. 454-55.) She was so depressed at times that she would not shower for a week. (Tr. 455.) She did not leave her home often. (Tr. 461.) If she went out, it was to attend doctor appointments, shop, or get gas; she was more comfortable going out with a family member. (Tr. 461-62.)

In a Function Report completed on August 5, 2023 (Tr. 3145-53), Ms. Morris reported that her mental health was getting worse; she did not want to leave the house or be around people and felt like she was being watched. (Tr. 3145, 3148-49). Her knees made it difficult for her to go up and down stairs or stand or sit for too long. (Tr. 3145, 3151.)

**E. Hearing Testimony**

**1. Plaintiff's Testimony**

Ms. Morris testified at the hearings on June 27, 2022 (Tr. 2836-44), January 4, 2023 (Tr. 63-70), and August 22, 2024 (Tr. 2859-83). At the most recent hearing, she testified that she believed she was disabled and could not work because she could not be around people or concentrate. (Tr. 2867.) When she was in a large group of people she had to leave or became really angry; she would hear things in her head telling her she was not good enough. (*Id.*) She

felt she would not "be here" if it were not for her grandparents and brother because her knee pain was so bad at times, and she could not take it. (*Id.*) She felt old but was only thirty-eight years old and wished she could be normal. (*Id.*) She did not shower as often as she should and wore the same clothes because she did not wash her clothes as often as she should. (Tr. 2871, 2883.) She helped around the house, but her grandfather also did things. (Tr. 2871-73.) Before needing to change positions or rest, she estimated she could stand, walk, or sit for 15-20 minutes at a time. (Tr. 2880-81.) Ms. Morris did stretches, took Tylenol, and used Lidocaine patches and heating pads to try to relieve her knee pain, but she said it did not work. (Tr. 2881.) She wrapped her knees and had recently started using a cane at the recommendation of her physical therapist. (Tr. 2881-82.) She had also used her grandmother's walker in the past. (Tr. 2881.)

**2. Vocational Expert Testimony**

Vocational experts ("VEs") testified at the three hearings. (Tr. 2844-47, 73-76, 2883-87.) At the third hearing, the VE testified that a hypothetical individual of Plaintiff's age, education, and work experience, with the functional limitations described in the ALJ's RFC determination (Tr. 2808-09, 2884-85), could perform representative light, SVP 2 positions in the national economy, including: cleaner, housekeeper; office helper; and merchandise marker (Tr. 2885). The VE testified that there would be jobs available in national economy if the hypothetical individual was further limited to sedentary exertional work. (Tr. 2885-86.) The VE testified there would be no jobs available if an individual was limited to standing and walking for one hour in a workday and should only navigate two to three stairs, noting that sedentary work could require up to two hours of standing and walking. (Tr. 2886-87.) The VE also testified that there would be no work available if the individual needed to work in isolation. (Tr. 2887.)

## III. Standard for Disability

Under the Social Security Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]

42 U.S.C. § 423(d)(2)(A).

To make a determination of disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations, summarized as follows:

1. If the claimant is doing substantial gainful activity, he is not disabled.

2. If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work. If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 416.920; *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987). Under this sequential analysis, the claimant has the burden of proof at Steps One through Four. *See Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the Residual Functional Capacity ("RFC") and vocational factors to perform other work in the national economy. *Id.*

## IV. Law & Analysis

### A. Standard of Review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record. *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009) ("Our review of the ALJ's decision is limited to whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence.").

When assessing whether there is substantial evidence to support the ALJ's decision, the Court may consider evidence not referenced by the ALJ. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Hum. Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989)). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive[.]" *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). "'The substantial-evidence standard . . . presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the

courts.'" *Blakley*, 581 F.3d at 406 (quoting *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)). Therefore, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Even if substantial evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

Although an ALJ decision may be supported by substantial evidence, the Sixth Circuit has explained that the "'decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007) (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004))). A decision will also not be upheld where the Commissioner's reasoning does not "build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

### B. First Assignment of Error: The ALJ Did Not Err When She Declined to Adopt the State Agency Psychologists' Limitation to a "Relatively Isolated Workstation"

In her first assignment of error, Ms. Morris argues that the ALJ erred when she did not adopt the opinion of state agency psychological consultants Drs. Souder and Haskins that Ms. Morris "[w]ould need a relatively isolated workstation" (Tr. 135, 145, 156, 167). (ECF Doc. 9, pp. 1, 20-22.) She asserts that "[t]he ALJ's rejection of the 'isolated workstation' limitation lacks a logical bridge between the medical evidence and her RFC findings" (*id*. at p. 20) and argues that "the record provides substantial evidence consistent with the need for an isolated workstation" (*id.* at p. 21). In response, the Commissioner argues the ALJ considered the

persuasiveness of the opinions of Drs. Souder and Haskins and sufficiently explained and supported her finding that the "relatively isolated workstation" limitation was not consistent with the record. (ECF Doc. 11, pp. 15-20.) More specifically, the Commissioner argues that the ALJ "discuss[ed] Plaintiff's mental status findings, her treatment history, her activities of daily living, and the medical opinions and prior administrative medical findings in the context of Plaintiff's allegations and testimony at the hearing, [and] . . . built an 'accurate and logical bridge' between the evidence of record and her conclusions." (*Id.* at p. 20.)

**1. Framework for Assessing the RFC and Medical Opinion Evidence**

A claimant's RFC "is the most [she] can still do despite [her] limitations." 20 C.F.R. § 416.945(a)(1). An ALJ must assess the "residual functional capacity based on all the relevant evidence in [the] case record," *id.*, such as: medical history; medical signs and laboratory findings; effects of treatment; reports of daily activities; lay evidence; recorded observations; medical source statements; symptoms; evidence from attempts to work; need for a structured living environment; and work evaluations, *see* Social Security Ruling (SSR) 96-8p, *Assessing Residual Functional Capacity in Initial Claims*, 61 Fed. Reg. 34474, 34477 (July 2, 1996).

"The responsibility for determining a claimant's residual functional capacity rests with the ALJ, not a physician." *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 157 (6th Cir. 2009) (citing 20 C.F.R. §§ 404.1546(c), 416.946(c)). Accordingly, an ALJ is "not required to recite the medical opinion of a physician verbatim in his residual functional capacity finding." *Id.* Even where an opinion was given great weight under prior regulation, the Sixth Circuit held "there [was] no requirement that an ALJ adopt a state agency psychologist's opinions verbatim; nor [was] the ALJ required to adopt the state agency psychologist's limitations wholesale." *Reeves v. Comm'r of Soc. Sec.*, 618 F. App'x 267, 275 (6th Cir. 2015).

Under applicable regulations, ALJs need "not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [a claimant's] medical sources." 20 C.F.R. § 416.920c(a); *see Sallaz v. Comm'r of Soc. Sec.*, No. 23-3825, 2024 WL 2955645, at *5 (6th Cir. June 12, 2024) (quoting 20 C.F.R. § 404.1520c(a)). However, they must evaluate the "persuasiveness" of medical opinions "using the factors listed in paragraphs (c)(1) through (c)(5)" of the regulation. 20 C.F.R. § 416.920c. Those five factors include supportability, consistency, relationship with the claimant, specialization, and other factors; but the most important factors are supportability[6] and consistency.[7] 20 C.F.R. §§ 416.920c(a), 416.920c(b)(2), 416.920c(c)(1)-(5). ALJs must therefore explain how they considered consistency and supportability but need not explain how they considered other factors. 20 C.F.R. § 416.920c(b)(2).

In reviewing an ALJ's medical opinion analysis, courts must consider whether the ALJ: considered the full record in assessing the persuasiveness of the opinion; appropriately articulated his reasons for finding the opinion unpersuasive; and made findings supported by substantial evidence. *See* 20 C.F.R. § 416.920c (governing how ALJs consider and articulate findings re: medical opinions); 20 C.F.R. § 416.920(e) (findings re: RFCs will be "based on all the relevant medical and other evidence" in the case record); *see also Blakley*, 581 F.3d at 405.

**2. The ALJ Properly Evaluated the Opinions of Drs. Souder and Haskins and Assessed a Mental RFC Supported by Substantial Evidence**

In assessing the medical opinions of Drs. Souder and Haskins, the ALJ explained:

> Janet Souder, PsyD, and Kristen Haskins, PsyD, reviewed the claimant's case file at the request of the State agency, the Division of Disability Determination

---

[6] "Supportability" is the extent to which a medical source's own objective findings and supporting explanations substantiate or support the findings in his or her opinion. *See* 20 C.F.R. § 416.920c(c)(1).

[7] "Consistency" is the extent to which a medical source's opinion findings are consistent with the evidence from other medical and nonmedical sources in the record. *See* 20 C.F.R. § 416.920c(c)(2).

> Services, on July 15, 2021 and November 23, 2021, respectively. Both consultants declined to adopt the prior mental residual functional capacity from the May 9, 2018 hearing decision because of the new diagnoses of post-traumatic stress disorder and borderline personality disorder. Dr. Souder expressed the medical finding that the claimant would be able to perform familiar simple, routine, and repetitive tasks in a setting without expectations for sustained close concentration, fast pace, or meeting strict production standards (B4A and B5A) while Dr. [Haskins] expressed the medical finding that the claimant would be able to perform familiar short cycle tasks in a setting without expectations for sustained close concentration, fast pace, or meeting strict production standards (B7A and B9A). <u>Both consultants expressed the following medical findings: the claimant would need a relatively isolated workstation</u>; able to interact briefly and superficially on an occasional basis with a small group of familiar coworkers and supervisors in a nonpublic setting; retains the capacity to adjust to minor and infrequent changes in a work setting; and the claimant's ability to handle routine stress and pressure in the work place would be reduced, but adequate to handle tasks without strict time limitations or production standards. They explained that the more recent mental status examinations showed difficulty trusting others, feeling judged, and reported difficulty with attention and concentration and racing thoughts. However, the claimant is able to help her grandparents, cook, clean, do laundry, and distracts herself with video games. She has difficulty being around a lot of people (B4A, B5A, B7A, and B9A).
>
> <u>Overall, their medical findings are persuasive because they are supported with a reasonable explanation. Their medical findings are persuasive because they are supported by the mental status examinations at MetroHealth and because they are consistent with the limited course of mental health treatment and the claimant's ability to help her grandparents</u>. <u>However, their finding that the claimant "would need a relatively isolated workstation" is not persuasive because it is not adequately supported. As discussed at Finding #4, the claimant is no more than moderately limited interacting with others. In particular, the claimant attends appointments without incident (see above). There is no evidence of problems getting along with family, friends, neighbors, or others. Although the claimant may prefer not to be around others, her ability to deal with others indicates that difficulties are neither marked nor extreme. Furthermore, the limitation of only occasional interaction with supervisors and coworkers and no interaction with the public is reasonable and adequately accounts for the claimant's social interaction limitations.</u> In addition, I have reworded some of their findings for preciseness and conciseness. I find the claimant can perform tasks that do not involve a specific production rate pace, assembly line work, or an hourly production quota; can have occasional interactions with supervisors and co-workers; no interaction with the public; and can deal with occasional changes in a routine setting.

(Tr. 2818-19 (emphasis added).) In her Step Three analysis (identified above as "Finding #4"), the ALJ found Ms. Morris had moderate limitations in interacting with others, explaining:

> In interacting with others, the claimant has a moderate limitation. In a "Function Report" dated August 5, 2023, the claimant stated that her conditions affect her ability to get along with others (B27E/7). The claimant testified that she cannot be around people. The claimant also testified that she lives with her grandparents who are retired and in their 70's. The claimant spends time with her brother (see Finding #5) and the claimant has a few friends (B15F/21). On examinations of the claimant by Ms. Pron, the claimant was adequately groomed, her behavior was sometimes tearful but she was consistently cooperative, and her speech was consistently spontaneous with normal rate and flow (see Finding #5). The claimant attends appointments without incident (see Finding #5). There is no evidence of problems getting along with family, friends, neighbors, or others. Although the claimant may prefer not to be around others, her ability to deal with others indicates that difficulties are neither marked nor extreme.

(Tr. 2807-08.) Thus, the ALJ provided a detailed explanation to support her finding that the state agency consultants' limitation to "a relatively isolated workstation" was not persuasive.

In support of her claim of error, Ms. Morris argues that "the record provides substantial evidence consistent with the need for an isolated workstation," citing abnormal mental status findings and Ms. Morris's statements to providers that she did not want to be around people, did not want to leave her home, experienced paranoia, and heard voices. (ECF Doc. 9, p. 21.) But the question before this Court is not whether there is substantial evidence in the record to support Ms. Morris's preferred findings. Even if substantial evidence supports a need for a "relatively isolated workstation," this Court cannot overturn the ALJ's finding to the contrary "so long as substantial evidence also support[ed] the conclusion reached by the ALJ." *Jones*, 336 F.3d at 477; *Blakley*, 581 F.3d at 406. The question before this Court is therefore whether Ms. Morris has shown that the ALJ's contrary finding lacked the support of substantial evidence. For the reasons explained below, the Court concludes that Ms. Morris has not made that showing.

Beginning with the findings and complaints highlighted in Ms. Morris's brief, a review of the ALJ's decision reveals that she discussed in detail the treatment visits where Ms. Morris made the sorts of complaints and demonstrated the types of mental status findings highlighted in

Ms. Morris's brief. (*See* Tr. 2810-15 (summarizing mental health treatment records from August 2021 through June 2024).) Having considered those treatment records, the ALJ concluded:

> I find that the mental status examinations and course of treatment in this case are not consistent with disabling mental impairment and are more consistent with the stated residual functional capacity. On examinations of the claimant by Ms. Pron of MetroHealth, the claimant's mood was usually depressed and anxious, her thought content had paranoid thoughts, and auditory hallucinations were often noted, but the claimant was adequately groomed, her behavior was sometimes tearful but she was consistently cooperative, her speech was consistently spontaneous with normal rate and flow, her thought process was consistently logical and organized, her attention and concentration were consistently sustained, her recent and remote memory were consistently within normal limits, her judgment was good or fair, and her insight was good or fair (see above). During the relevant timeframe, the claimant has not been psychiatrically hospitalized and there are no Emergency Department visits for acute psychiatric symptoms. Although the claimant has treated on a regular basis with Ms. Pron for medication management, the claimant has not required or received frequent or intensive outpatient mental health services. From all of this, I find the claimant's symptoms and limitations are not as severe as alleged.

(Tr. 2817.) Thus, the ALJ considered the complete record—including the subjective complaints and abnormal mental status findings highlighted by Ms. Morris—when she declined to adopt a limitation to a "relatively isolated workstation." Generally, the ALJ weighed Ms. Morris's complaints and abnormal mental status findings against her normal mental status findings and the fact that she did not need psychiatric hospitalization, acute emergency care for psychiatric symptoms, or "frequent or intensive outpatient mental health services." (Tr. 2817.) More specifically, the ALJ considered Ms. Morris's "limited course of mental health treatment," her "ability to help her grandparents" and "attend[] appointments without incident," and the lack of "evidence of problems getting along with family, friends, neighbors, or others" when she concluded that Ms. Morris "may prefer not to be around others, [but] her ability to deal with others indicates that difficulties are neither marked nor extreme." (Tr. 2818-19.) Ms. Morris has not shown that this finding lacked the support of substantial evidence.

Ms. Morris next challenges the ALJ's observation that she "could attend appointments and interact with family," arguing that "such limited interactions do not translate into the ability to tolerate sustained workplace interactions with supervisors and coworkers." (ECF Doc. 9, p. 21.) This argument is not persuasive since, as discussed above, the ALJ did not merely consider Ms. Morris's attendance at appointments or interactions with family. Instead, the ALJ explained that she considered: Ms. Morris's limited course of treatment, including no hospitalizations, acute emergency care, or frequent / intensive outpatient mental health care; no "evidence of problems getting along with family, friends, neighbors, or others," even while living with her grandparents, spending time with her brother, and having a few friends; and mental status findings consistently showing that Ms. Morris was adequately groomed and cooperative, with speech that was consistently spontaneous with normal rate and flow. Further, it is also notable that the ALJ adopted a mental RFC that imposed significant limits on Ms. Morris's interactions, limiting her to "occasional interactions with supervisors and co-workers" and "no interaction with the public." (Tr. 2809.) In this context, Ms. Morris has not shown that the ALJ improperly relied on Ms. Morris's ability to attend appointments or interact with family when he adopted a mental RFC that limited her interactions but did not require a "relatively isolated workstation."

Finally, Ms. Morris argues that APRN Pron's opinion that she had "extreme limitations in cooperating with others, handling conflicts, initiating or sustaining conversation, responding to social cues, responding appropriately to requests and criticism, and keeping interactions free of irritability, argumentativeness, or suspiciousness" also "reinforce[s] the state agency consultants' conclusion that she required an isolated workstation." (*Id.* at p. 22.) But again, the question before this Court is not whether there is substantial evidence to support the desired limitation; it is whether the ALJ's contrary finding lacked the support of substantial evidence.

In addressing the persuasiveness of APRN Pron's medical opinion regarding Ms. Morris's ability to interact with others, the ALJ explained in pertinent part:

> On March 17, 2022, Ms. Pron completed a form about the claimant's mental capabilities. Ms. Pron expressed the following medical opinion: . . . (2) The claimant's abilities to function in the area of interacting with others range from "moderate" limitations to "extreme" limitations . . . . In support of her assessment, Ms. Pron simply provided diagnoses of bipolar II disorder, generalized anxiety disorder, major depressive disorder, post-traumatic stress disorder, and borderline personality disorder (B11F/3-4).
>
> Ms. Pron's medical opinion of "marked" and "extreme" limitations is not persuasive because it is not supported by her simple recitation of the claimant's diagnoses. Ms. Pron's medical opinion of "marked" and "extreme" limitations is not persuasive because it is not consistent with the limited course of mental health treatment or the claimant's ability to take care of her grandparents. . . . Specifically regarding Part (2), Ms. Pron's medical opinion of "marked" and "extreme" limitations is not persuasive because it is not consistent with the claimant's ability to attend medical appointments at MetroHealth without incident (see above). . . . As discussed at Finding #4, I find the claimant is no more than "moderately" limited in any area.

(Tr. 2812-13.) Thus, the ALJ explained her reasons for finding the "extreme" limitations in social interaction described by APRN Pron were not entirely consistent with the evidence of record, and those explanations were consistent with the ALJ's more detailed explanations for both the mental RFC limitations she adopted and her rejection of a limitation to a "relatively isolated workstation." Ms. Morris's general citation to APRN Pron's opinion as "reinforc[ing] the state agency consultants' conclusion that she required an isolated workstation" falls far short of meeting her burden to show that the ALJ's finding lacked the support of substantial evidence.

For the reasons set forth above, the Court finds the ALJ adequately explained her findings regarding the persuasiveness of the state agency psychological consultants' opinions, including her rejection of the limitation to a "relatively isolated workstation," and built an accurate and logical bridge between the evidence and the result. Further, the Court finds Ms.

Morris has not met her burden to show that the ALJ's findings lacked the support of substantial evidence. Accordingly, the Court finds the first assignment of error lacks merit.

### C. Second Assignment of Error: The ALJ Did Not Err When She Declined to Adopt State Agency Consultant McKee's Limitation to One Hour of Standing or Walking

In her second assignment of error, Ms. Morris argues that the ALJ erred when she did not adopt the opinion of state agency medical consultant Dr. McKee that she could not stand or walk for more than one hour in an eight-hour workday (Tr. 2938). (ECF Doc. 9, pp. 1, 22-25.) Specifically, she argues the ALJ erred by: (1) "highlighting isolated normal findings while discounting consistent abnormal findings" and therefore "fail[ing] to construct the logical bridge required to connect the evidence with her RFC conclusion" (*id.* at pp. 23-24); (2) "neglect[ing] to properly account for Ms. Morris's obesity, which exacerbated her knee impairments" (*id.* at p. 24); and (3) "[r]ejecting consistent medical opinions without adequate explanation" (*id.* at pp. 24-25). In response, the Commissioner argues that the ALJ sufficiently explained her reasons for rejecting Dr. McKee's one-hour standing and walking limitation, did not "cherry-pick" evidence, adequately considered Ms. Morris's obesity, and sufficiently explained her reasons for rejecting the standing and walking limitation in Dr. Emami's medical opinion. (ECF Doc. 11, pp. 20-23.)

In assessing the persuasiveness of Dr. McKee's opinion, the ALJ explained:

> Related to the claimant's more recent Title XVI claim, Gerald Kloyp, MD, and Steve McKee, MD, reviewed the claimant's case file at the request of the State agency, the Division of Disability Determination Services, on August 7, 2023 and November 10, 2023, respectively . . . Dr. McKee noted the claimant had a claim pending at the federal level "so the ALJ cannot be adopted as was noted on the initial level RFC." Dr. McKee expressed the following medical findings: the claimant retains the ability to occasionally lift/carry 20 pounds and frequently lift/carry 10 pounds; stand and/or walk for a total of 1 hour of an 8-hour workday and sit for about 6 hours; and she has some postural and environmental limitations (B19A).
>
> <u>Dr. McKee's medical finding of stand and/or walk for a total of 1 hour of an 8-hour workday is not persuasive because such a severe limitation is not supported by the objective medical evidence recounted above. As recounted above, some of the</u>

> physical examinations of the claimant are normal while some of the physical examinations contain abnormal findings such as an antalgic gait, tenderness, and decreased range of motion of the knees. Significantly, however, the claimant has normal strength and intact sensation of the lower extremities, and there is no instability of the knees (see above). The medical finding of stand and/or walk for a total of 1 hour of an 8-hour workday is not persuasive because it is not consistent with the limited course of treatment for any medically determinable physical impairment and the claimant's activities of daily living including helping take care of her grandmother.

(Tr. 2819-20 (emphasis added).)

In support of her first argument—that the ALJ "highlight[ed] isolated normal findings while discounting consistent abnormal findings"—Ms. Morris cites: "substantial, longitudinal evidence of knee pathology" that includes x-rays, MRIs, and arthroscopic surgeries, with x-rays continuing to show arthritic changes post-surgery; and post-surgical treatment records where exams "repeatedly documented leg effusion [], tenderness [], decreased range of motion [], antalgic gait [], and crepitus []" and Ms. Morris's reported worsening pain with weight bearing. (ECF Doc. 9, pp. 23-24.) Ms. Morris argues that it was error for the ALJ to ignore this history.

But a review of the ALJ's decision reveals that the ALJ both discussed and considered Ms. Morris's imaging, surgeries, and post-surgical complaints and exam findings, including:

- 1/21 left knee x-ray (Tr. 2816);
- 2/21 left knee MRI (*id.*);
- 4/21 left knee surgery and post-surgical visit (Tr. 2809-10, 2816);
- 7/21 right knee x-ray (Tr. 2816);
- 9/21 visit for right knee, including exam findings (Tr. 2810-11);
- 10/21 right knee MRI (Tr. 2816);
- 10/21 visit for right knee, discussing MRI and planning surgery (Tr. 2811);
- 11/21 right knee surgery and post-surgical visit (Tr. 2811, 2816);
- 2/22 and 3/22 bariatric visits with normal exam findings and gait (Tr. 2812);

- 12/22 emergency room visit following a slip on the ice, with some abnormal examination findings and x-rays negative for acute injury (Tr. 2814);
- 1/23 visit after fall aggravated left knee and weight bearing aggravated right knee, exam noting mild effusion, some tenderness, and decreased range of motion (*id.*);
- 4/23 visit for knee pain with normal exam findings; declined pain injections (*id.*);
- 7/24 primary care visit, reporting knee pain, normal exam findings (Tr. 2815); and
- 7/24 physical therapy evaluation, noting antalgic gait (*id.*).

Thus, the ALJ acknowledged the abnormal imagery that preceded Ms. Morris's left knee surgery in April 2021 and her right knee surgery in November 2021, but also discussed her limited treatment for knee pain in 2022, 2023, and 2024, before concluding that "the objective medical evidence, including the signs and laboratory findings, and the course of treatment" were not consistent with disabling impairment or pain, but were "more consistent with the stated [RFC]." (Tr. 2809-16.) In so finding, the ALJ also considered Ms. Morris's reported activities, including caring for her grandmother, shopping, cooking, eating out three times a month, exercising, walking around the block twice in the evenings, and mowing the lawn on occasion, and found her "more active and capable than alleged." (Tr. 2817.) In addition, the ALJ found persuasive the medical opinions of state agency medical consultants Drs. Das and Torello, who opined that Ms. Morris could perform light work with certain limitations. (Tr. 2818.)

It is in the context of this evidentiary discussion that the ALJ found Dr. McKee's limitation to one hour of standing or walking "not persuasive" (Tr. 2820). *See Crum v. Comm'r of Soc. Sec.*, 660 F. App'x 449, 457 (6th Cir. 2016) (finding an ALJ need not reproduce a prior list of treatment records when analyzing an opinion). The ALJ accurately characterized the previously discussed evidence when she found "some of the physical examinations of the claimant are normal while some of the physical examinations contain abnormal findings such as an antalgic gait, tenderness, and decreased range of motion of the knees," and found

"[s]ignificantly" that Ms. Morris had "normal strength and intact sensation of the lower extremities, and . . . no instability of the knees[.]" (Tr. 2820.) The ALJ also explained that she found the one-hour standing / walking limitation not persuasive because it was "not consistent with the limited course of treatment" or Ms. Morris's "activities of daily living including helping take care of her grandmother." (Tr. 2820.) The ALJ had previously noted that Ms. Morris's course of treatment included two surgeries without complications, prescribed medications, and a short course of physical therapy, with an offer of steroid injections that Ms. Morris declined. (Tr. 2816.) Having reviewed the ALJ's entire written decision, the Court concludes that the ALJ did not "highlight[] isolated normal findings" or "discount[] consistent abnormal findings," nor did she ignore Ms. Morris's knee imagery or prior surgeries. (*See* ECF Doc. 9, p. 23.)

Turning to Ms. Morris's second argument—that the ALJ "neglected to properly account for [her] obesity, which exacerbated her knee impairments" (ECF Doc. 9, p. 24)—the Court finds this argument also lacks merit. At Step Two of the sequential evaluation, the ALJ found obesity to be a severe impairment. (Tr. 2806.) At Step Three, the ALJ found "none [of Ms. Morris's severe impairments] reache[d] the level of severity required by the Listing of Impairments, either singly or in combination." (Tr. 2807.) In discussing Ms. Morris's medical treatment visits at Step Four, the ALJ repeatedly noted Ms. Morris' body mass index ("BMI"). (*See, e.g.,* Tr. 2810 (9/21 right knee visit); Tr. 2812 (2/22 and 3/22 bariatric visits); Tr. 2814 (12/22 ER visit for fall); Tr. 2815 (2/24 and 7/24 primary care visits).) Further, in finding the objective evidence was not consistent with disabling impairment or pain, the ALJ acknowledged: "[i]n addition to her musculoskeletal impairments, the claimant is obese, with BMIs in the low 40's," attended some weight management appointments, and started the process for bariatric surgery. (Tr. 2816.) Considering all of the evidence, the ALJ concluded that "a light residual functional capacity with

some postural limitations [wa]s supported by the objective medical evidence and consistent with the claimant's diagnoses of osteoarthritis of the knees and obesity." (Tr. 2818.) Thus, contrary to Ms. Morris's argument, the ALJ did consider and account for Ms. Morris's obesity.

Finally, Ms. Morris argues summarily that "[c]onsistent medical opinion evidence further underscores the [ALJ's] error" in not adopting Dr. McKee's standing and walking limitation because medical expert Dr. Emami also "testified that she was limited to standing and walking only one hour per day." (ECF Doc. 9, p. 24.) She then asserts, without developed argument, that it was reversible error for the ALJ to "[r]eject[] consistent medical opinions without adequate explanation." (*Id.* at p. 25.) But a review of the ALJ's decision does not support a finding that the ALJ failed to adequately explain her reasons for rejecting Dr. Emami's opinion.

After considering Dr. Emami's opinion that Ms. Morris could stand and walk 30 minutes at a time and for one hour in a workday, and could never climb stairs, ladders, stoop, crouch, crawl, or kneel, the ALJ found the opinion not persuasive, explaining:

> [Dr. Emami] did not provide adequate support for such severe and extreme limitations at the hearing. Furthermore, as recounted above, some of the physical examinations of the claimant are normal while some of the physical examinations contain abnormal findings such as an antalgic gait, tenderness, and decreased range of motion of the knees. Significantly, however, the claimant has normal strength and intact sensation of the lower extremities, and there is no instability of the knees (see above). As such, I find a light residual functional capacity with some postural limitations is supported by the objective medical evidence and consistent with the claimant's diagnoses of osteoarthritis of the knees and obesity. Dr. Emami's opinion that the claimant needs a medical assistive device for walking is not persuasive for the reasons already outlined above.

(Tr. 2820.) Thus, the ALJ explained her reasons for not adopting the "severe and extreme" limitations in Dr. Emami's medical opinion. Those explanations track closely with the ALJ's previously stated reasons for rejecting Dr. McKee's one hour standing and walking limitation.

The ALJ therefore acknowledged the medical opinions of Drs. McKee and Emami and clearly explained why she did not find their one hour standing and walking limitations persuasive.

For the reasons set forth above, the Court finds the ALJ adequately explained her reasons for rejecting Dr. McKee's opinion that Ms. Morris could only stand or walk for one hour in an eight hour workday, and built an accurate and logical bridge between the evidence and the result. Further, the Court finds Ms. Morris has not met her burden to show that the ALJ's findings lacked the support of substantial evidence. Accordingly, the Court finds the second assignment of error lacks merit.

## V. Conclusion

For the foregoing reasons, the Court **AFFIRMS** the Commissioner's decision.

September 9, 2026

*/s/Amanda M. Knapp*
AMANDA M. KNAPP
United States Magistrate Judge